Rosario Occhipinti and Julia Occhipinti [1] v. Commissioner. Occhipinti v. Commissioner
Docket No. 5760-65
United States Tax Court
T.C. Memo 1969-191; 1969 Tax Ct. Memo LEXIS 105; 28 T.C.M. (CCH) 978; T.C.M. (RIA) 69191; September 23, 1969. Filed deQuincy V. *107 Sutton, Greater Miss. Life Bldg., Meridian, Miss., for petitioners. William O. Lynch and Harold Friedman, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for 1957 through 1962 as follows: 980 Taxable Year
Deficiencies
[2] Additions to Tax, Sec. 6653(a) Total
1957
$ 3,374.41
$ 168.72
$ 3,543.13
1958
72,077.40
3,603.87
75,681.27
1959
* 16,572.01
828.60
17,400.61
1960
* 43,144.89
2,157.24
45,302.13
1961
7,647.89
382.39
8,030.28
1962 6,903.96
345.20
7,249.16
Total
$149,720.56
$7,486.02
$157,206.58
Several issues have been settled by the parties, and the following issues remain for decision: (1) Whether petitioners are entitled, under section 105, to exclude from gross income as sick pay the respective amounts of $2,200 and *108 $2,600 for 1959 and 1960. (2) Whether certain checks issued by Town & Country Motel, Inc., during 1957 and 1958 in the respective total amounts of $1,261.50 and $96.41 are taxable income to petitioners for those years. (3) Whether petitioners realized a gain on the sale of their residence during 1959, and if so, in what amount. (4) Whether petitioners realized taxable income, in the form of constructive dividends, of $9,014, $48,024.31, and $49,607.37, during 1958, 1959, and 1960, respectively, on the payment by Jacqueline, Inc., of the principal and interest of a note signed by petitioner Rosario Occhipinti and Carlos Marcello. (5) Whether the proceeds of certain checks issued to petitioner Rosario Occhipinti by Motor Hotels of Louisiana, Inc., during 1959, 1960, 1961, and 1962, and a charge of $2,290 entered during 1960 on the records of that corporation in the account "Due from Officers-Rosario Occhipinti," constitute taxable income to petitioners. (6) Whether petitioners are entitled to deductions for unreimbursed business expenses claimed for 1957 through 1961. (7) Whether petitioners understated petitioner Rosario Occhipinti's distributive share of the profits of *109 Town & Country Motel, a partnership, for 1960, 1961, and 1962. (8) Whether, because of the percentage limitations of section 213, a deduction for medical expenses in the amount of $743.58 claimed by petitioners for 1961 is allowable. (9) Whether all or part of the underpayments of income tax due by petitioners for 1957 through 1962 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). General Findings of Fact Petitioners Rosario Occhipinti (hereinafter referred to as Rosario) and Julia Occhipinti, husband and wife, were legal residents of New Orleans, Louisiana, at the time they filed their petition. They filed their joint income tax returns with the district director of internal revenue, New Orleans, Louisiana, during each of the years 1957 through 1962. Issue 1. Sick Pay Exclusion Findings of Fact On their returns for 1959 and 1960 petitioners excluded from gross income the respective amounts of $2,200 and $2,600 as "sick pay." Respondent determined that the amounts so excluded were taxable income. The compensation with respect to which the exclusions were claimed was paid to Rosario by Motor Hotels of Louisiana, *110 Inc. (hereinafter Motor Hotels), his employer. At all times material to this issue Rosario was the president and a substantial stockholder of Motor Hotels. From October 28, 1958, to October 30, 1962, he was authorized to, and did, sign checks on behalf of Motor Hotels. On August 1, 1959, Rosario entered Hotel Dieu Hospital in New Orleans as a patient. Two days later a biopsy of a cystic lesion on the upper end of his left femur was performed. On August 8 he was discharged from the hospital, but on August 30 he was readmitted for treatment of a pathological fracture of his left femur through the cyst. A bone graft was performed on September 2, and he was discharged from the hospital on September 12, 1959. For a number of months thereafter Rosario was confined to his home in bed, where he received medical care, and was not permitted to place any weight on his leg. He was first allowed to visit the office of his physician on January 16, 1960, and he continued to receive medical care through the office visits. Beginning on March 22, 1960, he was permitted to bear part of his weight on his left leg; bearing full weight was begun in April 1960. At that time he was advised by his physician *111 to limit his 981 physical activities but was given progressive physical exercises. He was last seen by his physician, and discharged from further medical care for this ailment, on August 7, 1960. For most of the period from August 1, 1959, through at least April 1960, Rosario was unable to perform any substantial services for Motor Hotels. Officials of his employer visited his home from time to time and discussed business matters with him, but the nature of his duties was such that he could not participate extensively in the operations of Motor Hotels. While disabled Rosario continued to receive his salary from Motor Hotels. His total compensation was $12,000 in 1959 and $14,000 in 1960. The sums excluded from his gross income in his returns, $2,200 for 1959 and $2,600 for 1960, were part of his salary, computed at the rate of $100 per week for the period during which he was disabled. In their reply brief petitioners concede that the 1960 payments of $2,600 are not excludable from gross income. Opinion Section 105(a) provides, in general, that amounts received by an employee "through accident or health insurance" for personal injury or sickness shall be included in his *112 gross income to the extent that the amounts are attributable to contributions by the employer or are paid by the employer. But section 105(d) provides that the employee's gross income does not include payments referred to in section 105(a), up to $100 per week, if they constitute "wages or payments in lieu of wages" for the period during which he is absent from work on account of personal injury or sickness. Further, section 105(e) provides that for purposes of section 105 [3] "amounts received under an accident or health plan for employees * * * shall be treated as amounts received through accident or health insurance." *113 While section 105(d) refers to "wages or payments in lieu of wages," the exclusion provided by that section extends only to amounts referred to in section 105(a), i.e., amounts received through accident or health insurance. And it is now established that, for the purposes of section 105(d), "wages or payments in lieu of wages" are not excludable from gross income unless such wages or payments are received by the employee pursuant to a plan maintained by the employer. John C. Lang, 41 T.C. 352, 354-355 (1963); Estate of Leo P. Kaufman, 35 T.C. 663 (1961), affd. 300 F. 2d 128 (C.A. 6, 1962); Chism's Estate v. Commissioner, 322 F. 2d 956 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; see also Alan B. Larkin, 48 T.C. 629 (1967), affd., 394 F. 2d 494 (C.A. 1, 1968). It is true that the regulations under section 105 are cast in terms of an "arrangement" or "program, policy, or custom having the effect of a plan." Sec. 1.105-5(a), Income Tax Regs. Nevertheless, the repetitive references to a "plan" throughout section 105 and the Senate Finance Committee Report accompanying *114 that section's enactment (S. Rept. No. 1622, 83d Cong., 2d Sess. 183-185 (1954)) show that the section is limited by the requirement of a plan. Furthermore, it is clear that merely one of more ad hoc benefit payments do not constitute a plan: "Had Congress intended to exclude from gross income all ad hoc benefit payments arbitrarily made at the complete discretion 982 of the employer in the absence of any sort of prior arrangement or practice, the use of the term 'plan' would scarcely have been necessary." Estate of Leo P. Kaufman, supra at 666. Rosario's claim to exclusion of part of the payments which he received from Motor Hotels in 1959 must fail because of the complete absence of evidence of a plan, formal or informal, maintained by Motor Hotels for paying its employees during their illnesses. There is no evidence that the terms of Rosario's employment arrangement entitled him to these benefits or, indeed, that any other employee ever received such a benefit. The record shows merely that Rosario, an officer and major stockholder of the corporation, continued to receive his salary during his illness. Petitioners do not qualify for the exclusion. Issue 2. Checks *115 from Town & Country Motel, Inc., in 1957 and 1958 Findings of Fact During 1957 Rosario received the following checks from Town & Country Motel, Inc. (hereinafter T. & C. Motel): Date ofCheck
Check Number
Payee
Amount
Account Charged on Payor's Books
11- 1-57
0710
Rosario Occhipinti
$ 75.00
Unknown
11- 7-57
1531
Rosario Occhipinti
50.00
Misc. Expense
11-22-57
1580
Rosario Occhipinti
100.00
Misc. Expense
12- 7-57
1638
Rosario Occhipinti
11.50
Misc. Expense
12- 7-57
1642
Rosario Occhipinti
100.00
Unknown
12-12-57
1679
Rosario Occhipinti
750.00
Unknown
12-12-57
1704
Rosario Occhipinti
75.00
Unknown
12-19-57
1729
Rosario Occhipinti 100.00
Unknown
Total
$1,261.50 In addition, Rosario received from T. & C. Motel check no. 861 in the amount of $96.41, dated September 2, 1958. Respondent determined that the sums represented by these checks constituted taxable income to petitioners. T. & C. Motel, the payor of the checks, was owned by Rosario, Frank Occhipinti (hereinafter Frank), Merle Kimmerly, Mike Maroun, John Billistrea, Felice Gallenia, Carlos Marcello (hereinafter Carlos), and Salvador Marcello. During *116 1957 it was engaged in the construction of a motel in Shreveport, Louisiana, and a substantial amount of work was done under the supervision of Rosario's brother, Frank. Due to illness Frank was unable to continue the work, and Rosario went to Shreveport to replace him. Under an arrangement with the other owners of T. & C. Motel, Rosario was to be reimbursed for his actual expenses but was to receive no salary for his services. While he was in Shreveport he incurred expenses for food, lodging, laundry, transportation, and other incidental expenses. He submitted bills for his expenses to Mike Maroun, who issued to him as reimbursement for those expenses the checks listed above for 1957. Rosario incurred deductible traveling expenses during 1957 in the amount of $850. Opinion This issue is purely factual - whether the checks received in 1957 and 1958 by Rosario represented reimbursement for business expenses incurred by him on behalf of T. & C. Motel. The evidence is undisputed that Rosario was one of the shareholders in T. & C. Motel, that the corporation was engaged in the construction of a motel in Shreveport during 1957, that Rosario replaced Frank as supervisor during a *117 short period in 1957, and that the arrangement called for Rosario and Frank to be reimbursed for their expenses while engaged in carrying out this work. As we view the evidence, Rosario was "away from home in the pursuit of a trade or business" during the period of about 6 weeks in 1957 covered by these checks, and he is entitled to deduct his traveling expenses, including meals and 983 lodging, incurred during this period. Sec. 162(a)(2). [4]
Although Rosario did not offer documentary evidence to support his claimed expenses for 1957, we are nevertheless convinced that he incurred substantial deductible expenses. Using our best judgment as to the amount of such expenses, and bearing heavily on petitioners for their lack of adequate supporting records, we have found that Rosario incurred *118 traveling expenses of $850 during his stay in Shreveport in 1957. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Rosario offered no evidence as to the circumstances in which he received check no. 861, dated September 2, 1958, in the amount of $96.41. We therefore sustain respondent's determination as to this item. Issue 3. Sale of Residence, 6248 Paris Avenue Findings of Fact In 1957 petitioners contracted for the construction of a new residence, at 6248 Paris Avenue in New Orleans, on a lot which had cost them $16,250; the contract price for the construction was $43,500. On October 13, 1959, petitioners sold this residence for $87,500 and within one year purchased and occupied a new residence which cost $61,500. Petitioners reported no gain from the sale of their Paris Avenue residence in their joint income tax return for 1959. In his statutory notice of deficiency respondent determined that petitioners realized a longterm capital gain of $26,000 on the sale of the residence, computed as follows: Selling price
$87,500
Less basis:
Cost of lot
$16,250
Construction cost
43,500 59,750
$27,750
Less sec. 1034 exclusion 1,750
Taxable gain
$26,000
*119 The construction contract price did not include many additions and fixtures which were later added by petitioners. Respondent has conceded on brief that petitioners are entitle to additions to their adjusted basis of the residence in the following amounts: Extra electrical work
$ 324.69
Painting of exterior
987.00
Installation of patio
4,535.00
Drainage work
685.00
Kitchen carpentry 4,901.37
Total
$11,433.06 Respondent further concedes that petitioners paid a commission in the amount of $4,375 in connection with the sale. In addition to the foregoing items conceded by respondent, Town & Country Motel (hereinafter Town & Country), a partnership of which Rosario was a member, paid a local department store $6,847.73 on behalf of petitioners for wallpaper, panels, venetian blinds, draperies, carpeting, door stops, folding doors, bathroom fittings, and a chandelier for the Paris Avenue residence. The $6,847.73 was charged to Rosario's drawing account in Town & Country and paid by him in this manner. Petitioners' adjusted basis of the residence was $78,030.79, and the commission paid on the sale was $4,375. Petitioners realized taxable long-term capital *120 gain in the amount of $5,094.21 on the sale of their residence. Opinion The determination of petitioners' adjusted basis of their 6248 Paris Avenue residence at the time it was sold is a purely factual one. Respondent has conceded certain additions to petitioners' adjusted basis as originally determined in the notice of deficiency, and petitioners introduced into evidence invoices or other convincing evidence to establish further costs. Respondent contends that petitioners' proof as to these alleged additional costs is inadequate, but, while respondent's argument is sound as to certain items, we think our findings reflect a fair evaluation of the evidence. [5] 984 Issue 4, Payment of $100,000 Note and Related Interest Findings of Fact For some time immediately prior to October 30, 1958, Rosario *121 and others negotiated for the purchase from M. J. Carbone and L.A. West of a motel property known as Holiday Inn West. To hold title to the real estate, Jacqueline, Inc. (hereinafter Jacqueline) was organized under the laws of Louisiana on October 28, 1958, with authorized capital stock of 5,000 shares, of a par value of $100 each, and paid-in capital of $400,000. The articles of incorporation were recorded in the official records of Jefferson Parish, Louisiana, on October 29, 1958. The incorporators and initial officers of Jacqueline were Rosario, president, Frank, vice president, and Joseph H. Connolly, secretary-treasurer. They also were the original subscribers to the Jacqueline stock, subscribing to 2,100, 900, and 1,000 shares, respectively. This stock was issued as follows: Stock Certificate Number
Owner of Record
Number of Shares
Par Value
1
Rosario Occhipinti
1,050
$105,000
2
Rosario Occhipinti
1,050
105,000
3
Frank Occhipinti
90
9,000
4
Frank Occhipinti
90
9,000
5
Frank Occhipinti
90
9,000
6
Frank Occhipinti
90
9,000
7
Frank Occhipinti
90
9,000
8
Frank Occhipinti
90
9,000
9
Frank Occhipinti
90
9,000
10
Frank Occhipinti
90
9,000
11
Frank Occhipinti
90
9,000
12
Frank Occhipinti
90
9,000
13
Joseph H. Connolly
500
50,000
14
Joseph H. Connolly
250
25,000
15
Joseph H. Connolly 250
25,000
$0
Total
4,000
$400,000
*122 Although 2,100 shares were issued to Rosario and 900 shares were issued to Frank, these 3,000 shares were beneficially owned one-fourth by Frank, one-fourth by Rosario, and one one-half by Carlos Marcello. At the time the stock was issued it was the policy of the franchisor to issue Holiday Inn franchises only in the name of individuals, and stock ownership was taken in the names of Rosario and Frank, who had had long experience in the operation of motels. The other 1,000 shares, although issued in the name of Joseph H. Connolly, were actually owned by Joseph H. Connolly, Mary Connolly, J. Folse Roy, Frank Rockefort, and Felise Gallenia; the record does not show the respective interests of these individuals. On October 30, 1958, Jacqueline acquired title to the real estate and furnishings used in connection with the operation of Holiday Inn West. The total purchase price of this property was $1,675,000. The contract of purchase and the act of sale show that $400,000 of the purchase price was to be paid in cash. Jacqueline's paid-in capital of $400,000, recited in the articles of incorporation, was provided from three sources. First, Joseph H. Connolly and his group paid in cash *123 of $100,000. Second, a loan of $200,000 was made by the Krauss Company Employees Pension Fund (hereinafter Pension Fund) on a note in the amount of $210,000. The note was signed by Carlos, Salvador Marcello, Rosario, and Frank, the partners in Town & Country, and was secured by a pledge of certificates numbers 1 and 2, described above, representing 2,100 shares of Jacqueline stock, and a mortgage on Town & Country's leasehold. Third, Carlos and Rosario gave Carbone and West a note in the amount of $100,000; Carbone and West immediately discounted the note to the Whitney National Bank. The face amount of the note was accepted by Carbone and West in discharge of $100,000 of the total down payment of $400,000 to be paid by Jacqueline. During 1958, 1959, and 1960 Jacqueline made monthly payments of principal and interest on the note executed by Carlos and Rosario, in the following total amounts: Year
Principal
Interest
Total
1958
$ 8,000
$1,014.00
$ 9,014.00
1959
44,000
4,024.31
48,024.31
1960
48,000
1,607.37
49,607.37
Total
$100,00
$6,645.68
$106,645.68 985 Opinion Respondent contends that the sums paid by Jacqueline on the note - both *124 interest and principal - are taxable to petitioners as constructive dividends. Alternatively, he maintains that one-half of such amounts are taxable to petitioners and that Carlos is taxable on the other half. This issue is largely factual, and based on the entire record - including the note itself and the collateral evidence - we sustain respondent's alternative contention. Carlos and Rosario became indebted to Carbone and West for $100,000 on their note. Jacqueline paid the installments on the note as they became due, thereby discharging liabilities owed by its shareholders; such payments constituted a classical constructive dividend to the extent of available earnings and profits. [6] See sec. 316(a); Sullivan v. United States, 363 F. 2d 724, 728 (C.A. 8, 1966), certiorari denied 387 U.S. 905 (1967); Sachs v. Commissioner, 277 F. 2d 879, 882-883 (C.A. 8, 1960), affirming 32 T.C. 815 (1959), certiorari denied 364 U.S. 833 (1960). We think, however, that petitioners are entitled to deductions under section 163 to the extent of the interest paid by Jacqueline on their behalf. *125 Petitioners strenuously object, and contend that the note to Carbone and West did not constitute a liability of Carlos and Rosario - representing part of their share of Jacqueline's paid-in capital (which Jacqueline then used to satisfy part of the cash down payment for Holiday Inn West) - but rather was a liability of Jacqueline, and that Carlos and Rosario "simply accommodated the new corporation with credit when they signed the note, and without compensation to themselves." To support their contentions, petitioners would have us find that the Marcellos-Occhipintis contributed only $200,000 to Jacqueline's capital rather than the $300,000 originally contemplated and that 1,000 of the shares originally issued to Rosario and/or Frank were retired and held as treasury stock, with the result that (a) Jacqueline's paid-in capital was only $300,000 and (b) only 3,000 shares of Jacqueline stock were outstanding. We reject petitioners' contentions for several reasons. First, Jacqueline's articles of incorporation recite that $400,000 was paid in cash as capital; the contract to purchase Holiday Inn West called for a cash payment of that same amount; and the act of sale recited an actual *126 cash payment of $400,422.06. Second, the evidence, based on Jacqueline's records, clearly shows that 1,000 shares of the stock were issued to Joseph H. Connolly for the Connolly-Rockefort group, and that 2,100 shares (certificates 1 and 2) were issued to Rosario and 900 shares (certificates 3 through 12) to Frank. There is no substantial evidence to warrant a finding that Carlos, Rosario, and Frank were beneficial owners of only 2,000 of these shares and that the other 1,000 shares issued to Rosario and/or Frank were beneficially owned by the corporation as treasury stock. Third, the record is unmistakably clear that Salvador Marcello, a partner in Town & Country, was not a participant in the ownership of Jacqueline. See our findings and conclusions as to Issue 2 in Salvador Marcello, T.C. Memo. 1969-189, decided this day. It follows, therefore, that the partnership was not the owner of Jacqueline stock, but that the individuals - Carlos, Rosario, and Frank - were. Finally, Carlos and Rosario signed the note as makers, and Jacqueline's name appears nowhere on the note. All this evidence is inconsistent with petitioners' contention that Jacqueline was the true obligor on *127 the note and that Carlos and Rosario were merely accommodation endorsers.[7]
Issue 5. Checks from Motor Hotels Findings of Fact During 1959, 1960, 1961, and 1962, Motor Hotels issued the following checks, dated and charged on its books of account as follows: 986 Checks issued in 1959: Check Number
Date of Check
Amount of Check
Account Charged
180
1-14-59
* $ 5,000.00
Due from Officers-Rosario Occhipinti
271
2-24-59
250.00
Travel & Entertainment Expense
274
2-26-59
2,000.00
Cashed by Rosario Occhipinti-Account charged not shown
359
3-28-59
110.00
Travel & Entertainment Expense
422
4-12-59
300.00
Travel & Entertainment Expense
491
5-14-59
100.00
Travel & Entertainment Expense
555
6-10-59
100.00
Travel & Entertainment Expense
654
7- 9-59
160.00
Travel & Entertainment Expense
7-10-59
25.67
Auto Expense
691
8- 2-59
150.00
Travel & Entertainment Expense
769
8-16-59 55.00
Travel & Entertainment Expense
Total
$ 8,250.67
*128 Checks issued in 1960: Check Number
Date of Check
Amount of Check
Account Charged
1200
2-10-60
$ 54.82
Auto Expense
1232
2-19-60
185.00
Travel & Entertainment
1265
3-10-60
156.45
Auto Expense
1515
4-30-60
37.60
Auto Expense
1515
4-30-60
90.10
Auto Expense
1732
8-11-60 131.33
Auto Expense
Total
$ 655.30
Checks issued in 1961: Check Number
Date of Check
Amount of Check
Account Charged
824
10-12-61
$ 3,000.00
Not Shown
3127
11- 8-61 5,000.00
Due from Officers-Rosario Occhipinti
Total
$ 8,000.00
Checks issued in 1962: Check Number
Date of Check
Amount of Check
Payee
Endorsement
1223
1962
$ 5,000.00
Rosario Occhipinti
Rosario Occhipinti
3492
3-13-62
2,500.00
Town & Country
Town & Country
3941
8-21-62
* 3,000.00
Rosario & Frank
Rosario & Frank
Total
$10,500.00
Petitioners reported none of the foregoing checks in their taxable income. In *129 the notice of deficiency respondent determined that petitioners received taxable income in the amounts of such checks for the years 1959, 1960, 1961, and 1962, as well as the $2,290 charge, described below, in 1960. 1959 Six of the eight checks issued in 1959 charged to "Travel & Entertainment Expense" (nos. 271, 359, 422, 491, 555, and 654), totaling $1,020 constituted reimbursements of expenditures made by Rosario in connection with business travel and entertainment on behalf of Motor Hotels, and are not taxable to petitioners. Prior to entering the hospital on August 1, 1959, see Findings as to Issue 1 above, Rosario served on a national advertising committee for Holiday Inns of America, Inc., and was required to make frequent trips to Memphis, Tennessee. In addition, he made two trips to Detroit, Michigan, in connection with this work. He was also a member of the American Hotel Association and the Louisiana Hotel Association; his participation in both of these organizations required his attendance at periodic meetings on behalf of Motor Hotels and entailed travel and entertainment expense. Checks numbered 691, in the amount of $150, and 769, in the amount of $55, however, *130 were issued after Rosario entered the hospital on August 1, 1959, and could not constitute 987 reimbursement for travel and entertainment expenses. The proceeds of these two checks, therefore, constitute taxable income to petitioners. As to check nos. 180 and 274, Motor Hotels maintained during 1959 a petty cash account which was used to cover small purchases and to cash checks for guests. When the balance in this account was depleted Motor Hotels usually replenished it by transferring money thereto from other accounts or from related corporations. However, check nos. 180 and 274 were not used for this purpose; the debits to the petty cash account and the dates and amounts of these two checks do not correspond. The proceeds of these checks constitute taxable income to petitioners. An unnumbered check in the amount of $25.67, issued July 10, 1959, constituted reimbursement for expenses resulting from the use of Rosario's automobile in Motor Hotels' business, and is not taxable to petitioners. 1960 Check no. 1232 was issued to Rosario purportedly to reimburse him for travel and entertainment expense, but at the time the check was issued Rosario was still disabled from the *131 illness for which he was hospitalized on August 1, 1959. The proceeds of this check, therefore, constitute taxable income to petitioners. The remainder of the 1960 checks, totaling $470.30, were payable to third parties. They covered expenses for repairs and tires for an automobile owned by Rosario, which was used in part for personal purposes and in part for carrying on the business of Motor Hotels. The automobile owned by Motor Hotels was inoperative during part of 1960, and Motor Hotels used Rosario's automobile for purposes such as picking up guests from the airport. Part of the repair bills arose from an accident which occurred while a Motor Hotels employee was using the automobile on company business. Of the proceeds of these checks, the sum of $300 constitutes taxable income to petitioners; the sum of $170.30 constitutes reimbursed business expense. An account, "Due from Officers-Rosario Occhipinti," contains an entry in July 1960 of a charge of $2,290. This charge constitutes taxable income to petitioners. 1961 Check no. 3127, made payable to cash, was first endorsed by "Holiday Inn Motel" and then by "Al Barbin," who was the cashier for Motor Hotels during the years *132 in question. The check was used to replenish Motor Hotels' petty cash account. At the time the check was issued the accountant was unable to ascertain the use for which the check was drawn and, therefore, charged it to the account "Due from Officers." This account was used as a suspense account, and certain expenses were charged to it pending a determination of their proper classification. The proceeds of check no. 3127 are not taxable to petitioners. Check no. 824 was not used to replenish the petty cash account. There is no corresponding debit in the account, and Rosario was the last endorser. Its proceeds are taxable to petitioners. 1962 Check no. 3492, dated March 13, 1962, was made payable to Town & Country, and was endorsed for deposit to its bank account. Rosario did not negotiate this check, and it does not constitute income to petitioners. Check no. 3941 was actually in the amount of $6,000: $3,000 was charged to an account "Due from Officers-Rosario Occhipinti," and the other one-half to an account "Due from Officers-Frank Occhipinti." Check no. 1223 was drawn on Motor Hotels' "Gift Shop Account" in the amount of $5,000, payable to "Roy Occhipinti" and endorsed by *133 him. Roy Occhipinti is one and the same person as Rosario. The check is inscribed "loan." Check nos. 3941 and 1223 were not issued to replenish Motor Hotels' petty cash account; they were taxable distributions to Rosario in the full amount of check no. 1223 and to the extent of $3,000 in the case of check no. 3941. Opinion Again the issue is factual - whether the proceeds of certain checks issued by Motor Hotels during 1959 through 1962, as well as a charge in the amount of $2,290 entered during 1960 on the books of Motor Hotels, constitute income to petitioners. Our Findings are largely self-explanatory and do not require extensive discussion. In determining the portions of the 1960 checks which were respectively taxable income and reimbursed business expenses, we have relied upon Cohan v. Commissioner, supra. Petitioners argue that respondent had the burden of explaining the July 1960 journal entry of the $2,290 charge, on the ground 988 that amounts of journal entries are not, on their face, taxable income. However, the cases on which petitioners rely are clearly distinguishable in that they involved situations in which the actual transaction underlying *134 the bookkeeping entry was not in dispute. Here the charge on the corporate books is evidence of a distribution by the corporation. Cf. Northwestern States Portland Cement Co. v. Huston, 126 F. 2d 196, 199 (C.A. 8, 1942). Petitioners offered no explanation of the charge on the books or of any underlying transaction; due to this failure of petitioners to carry their burden of proof, respondent's determination must be sustained as to this item. Regarding check nos. 180 and 274 for 1959, 824 and 3127 for 1961, and 1223 and 3941 for 1962, petitioners' basic contention is that these checks were drawn by Motor Hotels to replenish a petty cash account and, beginning at least as early as 1962, a "House" bank account. These accounts were used primarily to cash checks of guests at the motel and to cover minor operating expenses. However, we are not convinced that any of these checks represented transfers to either of these accounts, with the exception of check no. 3127 in 1961, as to which there was detailed testimony. Our findings concerning the other checks are based on the facts that there were no corresponding debit entries in the petty cash account, that the checks were endorsed *135 by both Rosario and Frank (a circumstance inconsistent with a routine replenishment of petty cash), and that Rosario admitted at the trial that he could not recall the circumstances under which the checks were issued. Issue 6. Deductions for Unreimbursed Business Expenses Findings of Fact Petitioners claimed the following deductions as business expenses for the years indicated, all of which were disallowed in the deficiency notice: Item
1957
1958
1959
1960
1961
Gas & Oil
$ 175.00
$ 215.50
$ 301.75
$ 525.00
$ 561.74
Insurance
53.30
87.75
87.50
87.50
87.50
Tires & Maintenance
178.40
Depreciation
348.33
537.50
537.50
537.50
650.00
Travel & Entertainment
360.00
360.00
600.00
300.00
Repairs
147.40
Total
$1,115.03
$1,200.75
$1,674.15
$1,450.00
$1,229.24 All of these expenses relate to the operation of automobiles owned by Rosario. Except for the portions of 1957 and 1958 when he was employed in Shreveport by T. & C. Motel, Rosario devoted most of his working time during those two years to Town & Country. From the latter part of 1958 through 1961 he was primarily occupied with managing the Holiday Inn West in *136 New Orleans (which was operated by Motor Hotels). During much of this period Town & Country did not own an automobile; and whereas Motor Hotels owned an automobile, it was inoperative at times. As a result, Rosario was required to use his own automobiles to transport guests of the Holiday Inn West to and from the local airport and in running errands related to the motel's operation. When Rosario was disabled in 1959 and 1960 he continued to make an automobile available for some of these errands. He also used an automobile in entertaining guests and businessmen, in attending business meetings, and in looking after his other investments. It was the policy of T. & C. Motel, Motor Hotels (see Findings under Issue 5 above), and Town & Country to reimburse their employees (partners in the case of Town & Country) for expenses incurred in connection with their respective businesses. Opinion Petitioners failed to establish either the bases, rates of depreciation, or salvage values of the automobiles with respect to which depreciation was taken. For this lack of proof, respondent's disallowance of the depreciation deductions must be sustained. Respondent's determination as to the remaining *137 deductions must likewise be sustained. The claimed expenses were incurred by Rosario in carrying on the businesses of T. & C. Motel, Motor Hotels, and Town & Country, and were expenses of those organizations, not of Rosario individually. It is well settled that an employee may not 989 deduct the expenses of his corporation. Noland v. Commissioner, 269 F. 2d 108, 111 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 885 (1959). It is also axiomatic that a partner may not deduct business expenses of the partnership on his personal return unless there is an agreement among the partners that such expenses shall be borne by him out of his individual funds, Robert J. Wallendal, 31 T.C. 1249, 1252 (1959); yet petitioners produced no evidence of any such agreement. Finally, the claimed expenses were reimbursable by all three organizations, but Rosario evidently failed to seek reimbursement therefor. Cf. Coplon v. Commissioner, 277 F. 2d 534 (C.A. 6, 1960), affirming per curiam a Memorandum Opinion of this Court. For these reasons, we conclude that the disputed deductions must be disallowed. *138 Issue 7. Income from Town E Country Opinion Rosario was an active member of Town & Country during 1960, 1961, and 1962. Respondent determined that petitioners understated Rosario's distributive share of the profits of Town & Country for each of these years. In Salvador Marcello, supra, we made detailed findings as to Town & Country's income for these years. Those findings and our conclusions on the disputed issues are incorporated herein by this reference. In the opinion in Salvador Marcello, supra, we reserved for decision the question whether Rosario is entitled, in his individual capacity, to deductions for interest paid by Town & Country on a $210,000 note given to the Pension Fund. See Issue 4 above. The interest payments in question amount to $12,720.84 and $7,705.83 paid during Town & Country's fiscal years ending January 31, 1961, and January 31, 1962, respectively. Since Rosario owned a 25 percent interest in Town & Country; since 25 percent of the proceeds of the Pension Fund loan were used in the Jacqueline venture on his behalf; and since his distributive share of Town & Country's partnership income was reduced by 25 percent of the amounts *139 paid by Town & Country as interest on the Pension Fund loan, petitioners are entitled to deductions of 25 percent of the interest payments. [8] Allowance of such deductions will not cause any distortion of taxable income. Cf. Marcello v. Commissioner, 380 F. 2d 499, 503 fn. 10 (C.A. 5, 1967), modifying a Memorandum Opinion of this Court. Issue 8. Medical Expense Deduction Petitioners claimed a medical expense deduction of $743.58 for 1961. The percentage limitations prescribed by section 213, keyed to adjusted gross income, will require adjustments in the Rule 50 computation to conform the amount of the deduction with our foregoing conclusions and the stipulations and concessions of the parties. Issue 9. Additions to Tax under Section 6653(a) *140 Opinion Section 6653(a) [9] imposes an addition to tax if "any part of any underpayment" is due to "negligence or intentional disregard of rules and regulations (but without intent to defraud)." Respondent determined additions to tax for each of the years 1957-1962, inclusive, and the burden rests with petitioners to show that the underpayments were not attributable to negligence or intentional disregard of the rules. Petitioners offered no direct evidence to explain the errors in their returns or the returns of Town & Country, in which Rosario was an active partner. The negligence of the partnership in filing its returns must be imputed to him. Marcello v. Commissioner, supra at 505-507. *141 See Salvador Marcello, supra; Frank Occhipinti, 990 T.C. Memo. 1969-190, decided this day. Further support of respondent's determination of negligence may be found in our discussion of Issues 2, 5, and 6 above. The additions to tax are sustained. Decision will be entered under Rule 50. Footnotes
1. This case was tried in consolidation with Carlos Marcello, docket No. 3532-64; Anthony and Jeannine Marcello, docket No. 3533-64; Jacqueline Marcello, docket No. 3534-64; Carlos and Jacqueline Marcello, docket Nos. 3744-65 and 2908-66; Salvador J. and Florence Marcello, docket Nos. 3535-64 and 3981-65; Joseph C. and Barbara Marcello, docket Nos. 3743-65 and 2907-66; Frank and Lady Patricia Occhipinti, docket No. 5691-65; Churchill Farms, Inc., docket No. 6307-66; and Bayou Verret Land Co., Inc., docket No. 6308-66. The present case is severed for a separate opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
*. Respondent is seeking an increased deficiency for each of these taxable years, over and above the amounts shown above, pursuant to amended pleadings. ↩
3. SEC. 105. AMOUNTS RECEIVED UNDER ACCIDENT AND HEALTH PLANS. (a) Amounts Attributable to Employer Contributions. - Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. * * * (d) Wage Continuation Plans. - Gross income does not include amounts referred to in subsection (a) if such amounts constitute wages or payments in lieu of wages for a period during which the employee is absent from work on account of personal injuries or sickness; but this subsection shall not apply to the extent that such amounts exceed a weekly rate of $100. In the case of a period during which the employee is absent from work on account of sickness, the preceding sentence shall not apply to amounts attributable to the first 7 calendar days in such period unless the employee is hospitalized on account of sickness for at least one day during such period. If such amounts are not paid on the basis of a weekly pay period, the Secretary or his delegate shall by regulations prescribe the method of determining the weekly rate at which such amounts are paid. (e) Accident and Health Plans. - For purposes of this section and section 104 - (1) amounts received under an accident or health plan for employees, and (2) amounts received from a sickness and disability fund for employees maintained under the law of a State, a Territory, or the District of Columbia, shall be treated as amounts received through accident or health insurance.↩
4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and * * *↩
5. Since the gain realized by petitioners on the sale of the residence, $5,094.21, is less than the excess of the "adjusted sales price" of the Paris Avenue residence over the cost of the new residence, $87,500 - $61,500 = $26,000, all of the gain is recognized, and the section 1034 adjustment originally made by respondent in the notice of deficiency is no longer applicable.↩
6. Determination of the character of these distributions under section 301(c) will be made in the Rule 50 computation, using only Jacqueline's corporation income tax returns for its taxable years ending October 31, 1959, 1960, and 1961, which are in evidence, and treating as petitioners' basis $75,000, i. e., one-fourth of the $300,000 contributed to Jacqueline by the Marcello-Occhipinti group.↩
7. The record does not show whether an adjustment was made between Carlos and Rosario, on the on hand, and Frank, on the other. Respondent conceded at the trial that Frank realized no taxable income as the result of Jacqueline's payment of the note.↩
*. This check was in the total amount of $10,000, of which $5,000 was charged to the account "Due from Officers-Frank Occhipinti."↩
*. This check was in the total amount of $6,000.↩
8. Town & Country kept its records and filed its partnership returns on a fiscal year basis, ending January 31, while petitioners reported on a calendar year basis. The note to the Pension Fund being payable in equal monthly installments, petitioners' interest deduction for 1960 is 1/4 X 11/12 X $12,720.84; for 1961 it is 1/4 X 1/12 X $12,720.84 plus 1/4 X 11/12 X $7,750.83; and for 1962 it is 1/4 X 1/12 X $7,705.83.↩
9. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c) (1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩